1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Howard L. Jacobs, State Bar No. 149709
howard.jacobs@athleteslawyer.com
Katlin N. Freeman, State Bar No. 316253
katy.freeman@athleteslawyer.com
Law Offices of Howard L. Jacobs
31111 Agoura Rd., Suite 225
Westlake Village, CA  91361
(805) 418-9892
(805) 418-9899 facsimile

Attorneys for Plaintiff Ryan Humphreys

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

RYAN HUMPHREYS,

        Plaintiff,

    vs.

NATIONAL COLLEGIATE

ATHLETIC ASSOCIATION,

        Defendant.

Case No.: 2:26-cv-268

**COMPLAINT FOR INJUNCTIVE RELIEF**

## INTRODUCTION

1.    Plaintiff Ryan Humphreys brings this action to challenge Division I Bylaws 12.8, 12.02.6, and 14.3.3 (the "NAIA Eligibility Limitation Bylaws") of Defendant, the National Collegiate Athletic Association ("NCAA"). These Bylaws reduce the number of years which former participants in National Association of Intercollegiate Athletics ("NAIA") competition can play Division I baseball after transferring to an NCAA Division I school and unjustifiably restrains the ability of these college athletes[1] to earn money through the use of

---
[1] This lawsuit avoids using the term "student athlete" because it "is an NCAA marketing invention designed to 'conjure the nobility of amateurism,' assert 'the

their name, image, and likeness ("NIL") connected to their participation in the collegiate baseball labor market.   This action seeks declaratory and injunctive relief against Defendant for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      The Supreme Court's landmark decision in *NCAA v. Alston*, 594 U.S. 69 (2021) facilitated college athletes' ability to receive compensation for use of their names, images, and likenesses due to the NCAA's violation of federal antitrust laws. The commercial market for collegiate athletics under the NCAA, including NCAA baseball, has expanded tremendously in recent years.[2]

3.      With the proliferation of NIL and athlete revenue-sharing pursuant to the settlement in *NCAA v. House*, No.4:20-cv-03919 (N.D. Cal. June 6, 2025) (final approval order). The NIL market exploded from $917 million in 2021-22 to $1.67 billion in 2024-25. Among collegiate sports, baseball possesses the third highest market share of NIL compensation from collectives, which comprises 81.6% of total NIL compensation.[3]

4.      Importantly, however, college athletes playing baseball outside of the NCAA monopoly lack any meaningful ability to profit from their name, image, or likeness. NCAA's Division I Bylaws 12.8 (the "Five-Year Rule"), 12.02.6 (the "Intercollegiate Competition Rule"), and 14.3.3 (the "Three-Year Limitation") (collectively referred to throughout as the "NAIA Eligibility Limitation Bylaws") restrict athletes who begin their college baseball careers with NAIA programs from having the same opportunity to participate in DI baseball, and profit from its unique NIL opportunities, as the students who enter an NCAA

---

precedence of scholarship over athletic[s],' and 'obfuscate the nature of the legal relationship at the heart of a growing commercial enterprise.'" *Johnson v. Nat'l Collegiate Athletic Ass'n*, 108 F.4th 163, 171 (3d Cir. 2024).

[2] See Ex. 12, "ESPN sees College World Series smash records," Sports Business Journal, June 27, 2023.

[3] See Ex. 8, 2024-25 Annual Opendorse Report, at p. 5.

institution as freshmen.

5.    The NAIA Eligibility Limitation Bylaws neither promote competition nor attach any cognizable benefit to college athletes to the extent that they restrict the participation opportunities for athletes who attend NAIA schools before competing for an NCAA school. These rules harmfully restrict competition in the labor market for NCAA Division I baseball athletes and degrade the quality of Division I baseball consumed by the public. These are the very harms which federal antitrust law seeks to remedy. As he has overcome tremendous personal challenges in reaching his longtime goal of competing at the Division I level, Plaintiff Ryan Humphreys is intimately aware of the fleeting nature of college athletics. Because he cannot relive his short college career, the harm inflicted by the NAIA Eligibility Limitation Bylaws are irreparable and ongoing, and temporary and preliminary injunctive relief is necessary.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331 and 1337.

7.    This Court may exercise personal jurisdiction over Defendant because Defendant currently and continually transacts business in the Central District of California. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the Central District of California.

8.    Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. § 1391(b)(2).

## THE PARTIES

9.    Plaintiff Ryan Humphreys is a baseball pitcher currently enrolled at Pepperdine University in Malibu, California, where he resides. Before signing with Pepperdine as a graduate athlete, Humphreys played baseball at Westmont

College. At the time Humphreys initially enrolled at Westmont, its baseball team competed under the National Association of Intercollegiate Athletics, an entity completely separate and unrelated to the NCAA.[4]

10. Defendant NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Central District of California. These member institutions are organized into three divisions, and Division I includes over 350 schools. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, the Bylaws at issue in this case, Division I Bylaws 12.8, 12.02.6, and 14.3.3. The NCAA Constitution and Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be amended by votes of the member institutions or NCAA councils. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

11. The NCAA and its member institutions (about 1,100) effectively control the highest and most popular level of collegiate athletics. To participate at the NCAA Division I level, any academic institution must maintain NCAA membership and comply with the regulations as adopted by the NCAA Constitution and Bylaws including the Bylaws at issue in this case, 12.8, 12.02.6, and 14.3.3.

12. During the 2025 baseball season, 160 NCAA Division I baseball games were televised on ESPN's linear networks, and 3,900 Division I matchups were broadcast via ESPN's online streaming network. There are no reasonably

---

[4] Humphreys was deemed to have competed in two years of NAIA competition between the 2020 and 2023 seasons, each of which counted against his "four-year limitation" and five-year "eligibility clock". *See* Ex. 2.

comparable alternatives to collegiate athletics that provide national publicity through broadcasting, access and exposure to professional scouts, the ability to exchange athletics services for the payment of education and/or room and board, opportunities to profit from NIL agreements and revenue sharing, and competition at the highest level of collegiate athletics. In contrast, the National Association of Intercollegiate Athletics ("NAIA") is an unincorporated private association with 237 member-institutions, and no affiliation with the NCAA. There were zero NAIA games nationally televised during the 2025 season.

## FACTUAL BACKGROUND

### I.    Ryan Humphreys' Background

13.    Coming out of high school, Ryan Humphreys received two scholarship offers to play collegiate baseball: one from an NCAA Division I program, and one from Westmont College, then an NAIA program. *See* Ex. 3 at p. 1. Humphreys chose to sign with Westmont due to academic considerations as well as his belief that the coaching staff valued him more as a player and a person. *Id.*

14.    Plaintiff's 2020 freshman season with Westmont (NAIA) was impacted by Covid-19. He was subsequently granted an eligibility waiver pursuant to the NCAA's self-applied waiver relief initially only extended to NCAA athletes, but eventually provided to non-NCAA athletes like Humphreys.

15.    In the midst of his 2021 season with Westmont (NAIA), Plaintiff suffered a complete rupture of his Ulnar Collateral Ligament which ended his season and caused him to disenroll for the entire 2022 season (and school year) to focus on his rehabilitation following Tommy John Surgery. *Id.* Plaintiff returned to Westmont for the 2023 season – the team was still competing under the NAIA. As he was still recovering from Tommy John Surgery, Plaintiff's 2023 participation was extremely limited – he made only eight appearances, six of which he pitched for one inning or less.

16.    During the 2024 season, Westmont's first season competing under NCAA's Division II, Plaintiff had a breakout year. He finished with a team-best ERA (second in the PacWest conference), and a .188 season batting average against the best in the conference, and amongst the top ranks in Westmont's baseball history. Plaintiff received significant national attention from several of the top NCAA Division I baseball programs, at least two of which offered NIL and revenue-sharing considerations along with a scholarship and roster spot. *Id.* However, Plaintiff prioritized completing his bachelor's degree. *Id.* Significantly, many of his academic credits at Westmont would not have received full credit from the schools that were recruiting him, and transferring would have required between three and four additional semesters for Plaintiff to complete his bachelor's degree. For this reason, and because Westmont's Athletic Compliance office confirmed to Plaintiff that he would have an additional year of NCAA eligibility following the upcoming season, he decided to return to Westmont for the 2025 season. *See* Ex. 7, emails from Westmont College Athletics Compliance.

17.    Plaintiff's 2025 NCAA Division II season was historic. He posted a 12-1 record in 16 starts, tying Westmont's single-season record. Plaintiff pitched 88 innings (second in the PacWest conference), recorded 118 strikeouts (first in the PacWest, third in NCAA Division II), averaged over 12 strikeouts per nine innings (fourth in Westmont single-season history), and ended his Westmont career as the school's leader in career strikeouts per nine innings. Only two years after returning from Tommy John Surgery, Plaintiff was named as the NCAA Division II All-American First Team starting pitcher by the National College Baseball Writers Association, the Division II College Commissioners Association, and the American Baseball Coaches Association. He was also named the PacWest Pitcher of the Year.

18.    Following his 2025 season, with assurance from Westmont that he had one remaining year of eligibility, Plaintiff entered the transfer portal and

signed with NCAA Division I program Pepperdine University. Upon entering the portal, Plaintiff received no notice from the NCAA that he had no remaining eligibility. *Id.*

## II.   Ryan Humphreys Exhausted His Administrative Remedies and Has Not Delayed in Filing This Action

19.    Following his 2025 season, with assurance from Westmont that he had one remaining year of eligibility, Plaintiff entered the transfer portal and signed with NCAA Division I program Pepperdine University. Upon entering the portal, Plaintiff received no notice from the NCAA that he had no remaining eligibility. Ex. 3.

20.    After Plaintiff entered the transfer portal and signed with Pepperdine, the University was notified that Humphreys' Five-Year "Eligibility Clock" expired at the conclusion of the 2024-25 academic year (2025 baseball season), due to the fact that his clock was triggered by his enrollment at an NAIA institution. Pepperdine's Athletics Department promptly filed for an Extension of Eligibility Waiver pursuant to NCAA Division I Bylaw 12.8.1.7, which allows for the NCAA to approve waivers of the Five-Year Rule (12.8) if an athlete demonstrates that they were deprived of the opportunity to participate for more than one season within the five-year period of eligibility for reasons that are beyond the athlete's control. *See* Ex. 1 at p. 68. On September 26, 2025, the NCAA acknowledged that the 2022 season which Plaintiff did not participate due to recovery from Tommy John surgery constituted one missed opportunity, but he was unable to demonstrate another missed opportunity. *See* Ex. 2 at p. 2. The NCAA declined to acknowledge the 2020 Covid season as a "missed opportunity" under 12.8.1.7 on the grounds that "2019-20 academic year cannot be considered a denied participation opportunity... given [Humphreys] received previously approved extension of eligibility waiver for that season." *Id.*

21.    Plaintiff filed an Appeal to the NCAA's Legislative Committee on

the basis that the circumstances surrounding his UCL tear (two seasons extremely limited, and one completely foregone) amounted to Circumstances of Extraordinary or Extreme Hardship, entitling him to an Eligibility Waiver pursuant to Bylaw 12.8.1.7.1.3. The Appeal was denied on December 19, 2025, with the same rationale, *verbatim*, at the initial denial. *See* Ex. 4. As such, Plaintiff exhausted his administrative remedies with the NCAA and did not delay in bringing forth this action.

## III.  The NCAA is Governed by Self-Created Regulations that Discriminate Against Former NAIA Athletes

22.    Each NCAA Division is governed by its own regulatory bylaws. Several of the bylaws applicable to Division I schools are at issue in this lawsuit.

### A.  The "Five-Year Rule" and Eligibility Clock (NCAA Bylaw 12.8.1)

23.    NCAA Division I Bylaw 12.8 (the "Five-Year Rule") provides as follows:

> "A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies *in a collegiate institution...*" Ex. 1 at p. 54.

24.    The athlete's five-year timeline is known as an "Eligibility Clock." *See* Ex. 1 at p. 54. The Eligibility Clock starts to run from the date when an athlete registers as a full-time student at any "collegiate institution," regardless of whether such institution is a member of the NCAA (let alone an NCAA Division 1 school) and regardless of whether the athlete is competing in a sport at the non-NCAA institution. *Id.*

25.    The NCAA published a Four-Year Transfer Guide for athletes seeking to transfer from NAIA institutions to the NCAA. Ex. 5, NCAA Guide for

Four-Year Transfers 2024-25, at p. 13. The NCAA's Guide for Four-Year Transfers designates an entire section to the Eligibility Clock and explains that the Five-Year Rule is designed to "move student-athletes toward graduation in a timely manner." *Id*. In other words, by the NCAA's own express acknowledgment, the Five-Year Rule is not designed for any pro-competitive purpose. The Five-Year Rule manifestly harms collegiate athletes who begin their careers at NAIA institutions by effectively limiting their ability to participate at the Division I level and gain access to the opportunities, including NIL compensation, uniquely available to NCAA Division I participants. Because the NCAA Eligibility Clock is triggered by registration at an NAIA institution, if an individual spends any time at an NAIA school, their window of participation in NCAA Division I is limited; while an athlete who begins at an NCAA Division I school has unrestraint access to the benefits of four seasons of DI participation (including NIL) within five years.

**B.    The "Intercollegiate Competition Rule" (NCAA Bylaw 12.02.6)**

26.    The NCAA defines "intercollegiate competition" (of which a student-athlete is limited to four years) as "occur[ing] when a student-athlete in *either a two-year or a four-year collegiate institution* does any of the following: ... (a) Represents the institution in any contest against outside competition." Complaint Ex. 1 at p. 46, NCAA Division I Bylaw 12.02.06.

27.    By failing to designate *NCAA* participation as triggering Competition for purposes of Division I eligibility, the Intercollegiate Competition Rule similarly harms athletes who begin their collegiate careers at NAIA schools. While NAIA institutions are not part of the NCAA monopoly and NAIA athletes have no meaningful opportunity to earn NIL Compensation, the NCAA still subtracts one season of NCAA Division I eligibility from an athlete for each year they compete at an NAIA school.

**C.     The "Three-Year Transfer Limitation" (NCAA Bylaw 14.3.3) and the "Covid Extension"**

28.     NCAA Division I Bylaw 14.3.3 limits all NAIA transfers to a maximum of three years of NCAA Division I competition: "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I." Ex. 1 at p. 161. Again, there is no cognizable procompetitive justification for a rule that deprives athletes of one year or Division I baseball eligibility – and the associated NIL compensation opportunities – simply because they first competed at an NAIA institution, particularly while grating the full four years of eligibility to those who enroll directly in a school within the NCAA's monopoly.

29.     The NCAA amplified the anticompetitive effects of the Three-Year Transfer by issuing amended guidelines in response to the Covid-19 pandemic, permitting certain athletes to compete for more than four years in a window. This extension provided additional years of Division I competition and corresponding NIL/revenue sharing opportunities to athletes who began their careers within the NCAA monopoly. Complaint Ex. 6, NCAA Division I COVID-19 Self-Applied Waiver Relief for Season of Competition and Extension of Eligibility. In other words, any student enrolled at an NCAA Division I school in the Fall of 2020 received a one-year extension on their eligibility clock and had their 2020 season disregarded as a season of participation – effectively granting them six years to play five seasons. While the NCAA subsequently ruled to make the Covid Extension available for non-NCAA athletes, this extension did not appear to remove the Three-Year Transfer Limitation for such athletes.

**D.     Application of NAIA Eligibility Limitation Bylaws to Plaintiff Ryan Humphreys**

30.     Plaintiff Ryan Humphreys' college recruitment came down to two schools: Westmont College, an NAIA school, and an NCAA Division I program.

*Ex. 2*. Plaintiff's decision to sign with Westmont was motivated by Westmont's superior academic offerings and reputation as well as his belief that Westmont's coaching staff valued him more as an athlete and player. Significantly, as Plaintiff's college recruitment and commitment predated the *Alston* decision, NIL opportunities were not a part of his consideration.

31.    In the middle of the 2021 season, his second year pitching for Westmont College's baseball team (NAIA), Plaintiff Ryan Humphreys ruptured his Ulnar Collateral Ligament and underwent Tommy John surgery. Plaintiff missed the rest of the 2020-21 season and unenrolled from school to completely focus on rehabilitation, missing the entirety of the 2021-22 NAIA season. Plaintiff returned in an extremely limited fashion in 2022-23 (NAIA), where he made eight appearances, six of which he pitched for one inning or less. During the 2019-20, 2020-21, and 2022-23 seasons, Westmont College was an NAIA school. As such, Humphreys had no opportunity to earn NIL compensation during this time.

32.    During the 2023-24 season, Westmont's first season competing under NCAA's Division II, Plaintiff had a breakout year. He finished with a team-best ERA (second in the PacWest conference), and a .188 season batting average against the best in the conference, and amongst the top ranks in Westmont's baseball history. Plaintiff was receiving national attention from Division I schools but wanted to complete his bachelor's degree before he entered the transfer portal. *See* Ex. 2.

33.    Plaintiff's 2024-25 NCAA Division II season was historic. He posted a 12-1 record in 16 starts, tying Westmont's single-season record. Plaintiff pitched 88 innings (second in the PacWest conference), recorded 118 strikeouts (first in the PacWest, third in NCAA Division II), averaged over 12 strikeouts per nine innings (fourth in Westmont single-season history), and ended his Westmont career as the school's leader in career strikeouts per nine innings. Only two years after returning from Tommy John Surgery, Humphreys was named as the NCAA

Division II All-American First Team starting pitcher by the National College Baseball Writers Association, the Division II College Commissioners Association, and the American Baseball Coaches Association; and the PacWest Pitcher of the Year.

34.    Plaintiff, having completed his bachelor's degree at Westmont, entered the transfer portal, signed with Pepperdine University (NCAA Division I) and enrolled as a graduate MBA student. Complaint Ex. 3. *See also*, Complaint Ex. 7, Emails from Westmont Athletic Department re Transfer Portal Eligibility. After he entered the transfer portal, after he signed with Pepperdine University, and after he enrolled in Pepperdine's MBA program, the NCAA, for the first time, informed Pepperdine that Plaintiff had no eligibility remaining, as his five-year "Eligibility Clock," triggered by NAIA enrollment in 2020, had expired. The NCAA then denied Pepperdine University's extension of eligibility waiver request (on behalf of Humphreys) on the grounds that he "had at least four participation opportunities including 2020-21 [NAIA], 2022-23 [NAIA], 2023-24 [NCAA DII], and 2024-25 [NCAA DII] academic years when he competed." *See* Complaint Ex. 2, NCAA Denial of Eligibility Waiver Request. The decision cited the NCAA's NAIA Eligibility Limitation Bylaws. *Id.*

35.    Applied collectively, the NAIA Eligibility Bylaws, in combination, violate Section 1 of the Sherman Act through their restraint of the market for NCAA Division I college baseball athletes by preluding Ryan Humphreys and similarly situated baseball players who enrolled in NAIA institutions from gaining access to potential NIL compensation while playing four years of NCAA Division I college baseball.

36.    The Five-Year Rule (NCAA DI Bylaw 12.8) violates the Sherman Act by running an athlete's Eligibility Clock while the athlete is at a non-NCAA institution and cannot access reasonably commensurate NIL opportunities. The Eligibility Clock being triggered by Humphreys' enrollment at a non-NCAA

institution precluded his access to four years of NCAA Division I participation. In essence, The Five-Year Rule punishes athletes for their decision to enroll at non-NCAA schools prior to joining NCAA programs. The harm is particularly apparent in Humphreys' case, as his decision to enroll at an NAIA school was based on academic considerations, which the NCAA has ironically identified as a justification to the very NAIA Eligibility Restriction Bylaws which limit Humphreys' Division I participation. Additionally, when Humphreys was being recruited by top Division I programs in the transfer portal following the 2024 season with promises of NIL compensation and revenue sharing, Humphreys' ultimate decision to return to Westmont was also based on academic considerations. *See* Ex. 3. Because of lack of reciprocity in regard to Humphreys' academic credits from Westmont, transferring to one of the Division I institutions offering scholarship, NIL compensation, and revenue sharing would have required between three and four additional semesters to complete his four-year degree. *Id.* While Humphreys was provided information from Westmont that confirmed he would have an additional year of eligibility following the 2025 season, his eventual decision to return to Westmont was based on his prioritizing the completion of his bachelor's degree. *Id.* Essentially, as applied, the Five-Year Rule creates an ultimatum for athletes in Humphreys' position to either delay the completion of their academic studies in contravention to the NCAA's own stated objectives. *See* Ex. 5 at p. 13.  If the NCAA amended its Bylaws to trigger athletes' Eligibility Clock upon participation at an NCAA institution (rather than upon registration at a "collegiate institution" as currently identified), individuals like Humphreys would not be punitively denied critical Division I opportunities solely based on the decision to initially attend a non-NCAA monopoly institution. Because the vast majority of collegiate athletes who compete outside of the NCAA monopoly do not have access to earn NIL compensation or revenue sharing, unfairly restricting their participation amounts to a restraint on trade.

37.    The Intercollegiate Competition Rule (NCAA DI Bylaw 12.02.6) violates the Sherman Act by improperly treating NAIA competition—where athletes have little to no access to NIL compensation—as reasonably equivalent to the opportunity to earn NIL compensation and revenue sharing while competing in NCAA Division I baseball. The Three-Year Limitation (NCAA DI Bylaw 14.3.3) violates the Sherman Act by stripping athletes of one year of Division I baseball and associated NIL compensation and revenue sharing with no cognizable purpose other than to punish athletes' decision to attend a non-NCAA monopoly institution before transferring. The 2020 Covid Extension aggravated the inequity by allowing athletes enrolled at Division I institutions during the 2019-20 academic year to extend their eligibility and NIL earning potential without providing the same opportunities to NAIA athletes.

38.    The unequal treatment stemming from the NCAA's NAIA Eligibility Limitation Bylaws and Covid-related policies have harmed, and continue to harm, Ryan Humphreys and similarly situated athletes.

**E.    The "Rule of Restitution": NCAA Bylaw 12.11.4.2**

39.    Should the Court grant Ryan Humphreys injunctive relief, it will also need to address NCAA Division I Bylaw 12.11.4.2, known as the "Rule of Restitution," which allows the organization's board of directors to enact potential punishments including vacating wins, postseason bans, and financial penalties, should an athlete be allowed to participate as a result of a court providing injunctive relief.  *See* Complaint Ex. 1 at p. 65-66.

40.    For the Court's temporary restraining order and preliminary injunction to be effective in this case, Humphreys respectfully requests that this Court enjoin the NCAA's application of the Rule of Restitution against Humphreys or Pepperdine University. The Court in *State of Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F.Supp.3d 583, 601 (N.D. W. Va. 2023) ruled that the Rule of Restitution's "purpose is to punish challenges to the NCAA's

14

anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor."

## RELEVANT MARKETS

41.    The NAIA Eligibility Limitation Bylaws affect the labor market for Division I baseball players. Within this market, collegiate athletes like Plaintiff compete for roster and scholarship spots on Division I baseball teams and those NCAA Division I teams compete against each other to recruit the best college athletes to compete on their teams. The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and engage in on-field competition and competition in the relevant labor markets throughout the United States.

42.    There are no alternatives to the NIL compensation opportunities, revenue sharing opportunities, or other benefits which college baseball players receive from participating in NCAA Division I competition. The exposure to professional scouts, along with the financial benefits described, makes participation in this labor market unique. The NCAA's and its member institutions' transactions within this market are unquestionably commercial in nature—they significantly affect the future earning potential of college baseball players and yield significant financial revenue for the member institutions from the vast and increasing consumer interest in college baseball. *See* Ex. 12 ("Over 16 games across ESPN, ESPN2 and ESPNU, the [2024 NCAA Division I College Baseball World Series] averaged 1.6 million viewers, marking the best CWS tournament figures since ESPN started carrying the event"). NIL opportunities are effectively exclusive to NCAA Division I institutions. Revenue sharing for athletes pursuant to the *House* settlement are also limited to Division I athletes. Humphreys had no reasonable opportunity to earn any NIL compensation or revenue sharing, and earned none, when he competed for an NAIA program.

43.     While the NCAA is a non-profit organization, the transactions its member institutions make with college athletes generate significant financial revenue for member institutions and substantially effect the future earning potential of college baseball athletes, as these transactions include scholarships and, in many cases, revenue sharing, in exchange for the athlete's services. These college athletes, in return, receive the ability to develop and showcase their abilities—essential to their future earning potential. As such, the transactions between these member institutions and college athletes are inherently commercial in nature and fall under the purview of the Sherman Act.

## ANTICOMPETITIVE EFFECTS

44.     The NCAA enacts and enforces rules which it claims promote the well-being and educational progress of college athletes and preserve the amateurism of Division I college sports.

45.     The NCAA and its member institutions adopt these rules through the member institutions and the Division I Council, making these rules equivalent to horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I college baseball athletes.

46.     As exemplified in Plaintiff's case, the NAIA Eligibility Limitation Bylaws restrain college athletes from improving their personal growth, general well-being, and economic opportunity through academic progress, NIL compensation opportunities, and revenue sharing opportunities through a full four-year Division I playing experience, a freedom afforded to all athletes who enroll at NCAA Division I programs as freshmen, but not to individuals who initially enroll at non-NCAA programs. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college baseball athletes and consumers.

I.    **The NAIA Eligibility Limitation Bylaws Effects on College Baseball Players in the Relevant Labor Market**

47.    The NAIA Eligibility Limitation Bylaws effectively amount to a horizontal agreement between the NCAA and its member institutions to limit the amount of time athletes may play Division 1 college baseball players because they have chosen (often times, as is the case here, before the introduction of NIL payments) to attend a non-NCAA institution prior to competing for a Division I NCAA program.

48.    The NAIA Eligibility Limitation Bylaws harm NAIA and former NAIA college baseball players in the following areas of the relevant labor markets: (1) when an athlete is deciding whether to attend an NAIA program after graduating from high school; and (2) when an athlete is deciding to return to their NAIA program or transfer to an NCAA Division I program.

49.    NAIA Eligibility Limitation Bylaws harm athletes when considering what to do after graduating from high school. As was the case with Humphreys following high school graduation, an athlete planning to compete in college baseball weighs and considers several options including, but not limited to, attending an NCAA Division I school, attending an NAIA or non-NCAA institution such as Westmont College, going to prep school, or taking a gap year. Each of these listed options provide the possibility of the athlete competing for at least four years at the Division I level except for one: enrolling at an NAIA school.

50.    NAIA (or other non-NCAA monopoly) collegiate athletes deciding whether to transfer to an NCAA Division I program are harmed by the NAIA Eligibility Limitation Bylaws. Because the NAIA Eligibility Limitation Bylaws trigger athletes NCAA Division I "Eligibility Clock" with enrollment at an NAIA institution, deciding to return to their NAIA school to complete their degree effectively limits or precludes athletes' ability to participate at the Division I level. *See, e.g.*, Ex. 3 at para. 3.

51.    The lost opportunity that comes from being denied one or more seasons of NCAA Division I participation is significant and cannot easily be remedied. Each game, scrimmage, and practice missed is a missed opportunity to develop skills, gain exposure to professional scouts, market themselves for NIL compensation, earn revenue sharing money, and generally fulfill lifelong dreams of competing at the highest collegiate level. Each season of missed competition causes immeasurable and irreparable harm to college athletes like Humphreys.

## II.    The NAIA Eligibility Limitation Bylaws' Effects on Consumers

52.    The negative downstream effects on consumers of college baseball as a result of the NAIA Eligibility Limitation Bylaws cannot be ignored. When college athletes, particularly those who have demonstrated ability at the level of Plaintiff Ryan Humphreys (*See* Ex. 3 at para. 4), are precluded or restricted from competing simply because they previously attended an NAIA institution, the value of the product that the NCAA provides to its consumers is diminished. Following the 2025 season, Humphreys was named as NCAA Division II All-American First Team starting pitcher by the National College Baseball Writers Association, the Division II College Commissioners Association, and the American Baseball Coaches Association. Humphreys finished the season with 118 strikeouts, averaged over 12 strikeouts per nine innings (fourth in Westmont College single-season history, and ended his Westmont career as the school's all-time leader in career strikeouts per nine innings. Humphreys, who was recruited by and signed to Pepperdine University out of the transfer portal, was projected to provided needed leadership to a young roster and be a significant contributor amongst the team's pitching staff. *See* Ex. 11 at para. 4.

53.    Losing Plaintiff will make Pepperdine less competitive in the NCAA Division I's West Coast Conference this year, making Pepperdine games less compelling to watch—both for Pepperdine fans and for consumers of college baseball.

## **LACK OF PROCOMPETITIVE JUSTIFICATION**

**I.    There is No Procompetitive Justification for the NAIA Eligibility Limitation Bylaws**

54.    It is submitted that the above demonstrates the harmful anticompetitive effect of the NAIA Eligibility Limitation Bylaws on the Division I labor market for baseball players like Ryan Humphreys. As such, the burden shifts to the NCAA to establish a procompetitive justification for the restrictive rules.

55.    In its publications regarding the transfer process for athletes moving from NAIA to NCAA institutions, the NCAA has maintained that the Eligibility Clock (Bylaw 12.8.1) is "designed to move student-athletes toward graduation in a timely manner." Ex. 5, 2024-25 NCAA Guide for Four-Year Transfers, at p. 13. As demonstrated by the very circumstances surrounding Plaintiff Ryan Humphreys' transfer, these restrictive regulations do nothing to encourage the completion of academic degrees; in fact, they have the opposite effect. The NCAA does not mandate how many transfer credits from an NAIA each member institution must accept. As such, following his 2023-24 season where Plaintiff was named second-team all-conference and achieved the best batting average against in the conference, he received significant interest from Division I programs. However, knowing that transfers to certain Division I schools would have very few acceptable transfer credits, potentially forcing him to retake classes and prolong the timeline to graduate, Plaintiff Ryan Humphreys decided to return to Westmont for the primary purpose of completing his bachelor's degree. Complaint Ex. 3 at p. 1.[5] While the NCAA may argue that academic progress is a procompetitive justification for these targeted eligibility restrictions, in reality the

---

[5] Plaintiff was wrongfully informed by Westmont's athletic staff that he had two more years of NCAA eligibility following the 2023-24 season.

NAIA Eligibility Limitation Bylaws clearly punish Plaintiff for prioritizing the completion of his four-year degree.

56.    The NCAA may also argue that the NAIA Eligibility Limitation Bylaws preserve the NCAA's "amateurism model." Restricting college athletes from competing in NCAA Division I baseball merely because they began their education at a non-NCAA monopoly institution bears no legitimate connection to preserving amateur status. Any NCAA arguments suggesting otherwise are pretextual and fall well short of justifying the rules' harmful anticompetitive effect.

## II.    Any Potential procompetitive Justifications for the NAIA Eligibility Limitation Bylaws Could Be Accomplished by Less Restrictive Means

57.    It is primarily submitted that defendant's expected reliance on amateurism and academic considerations as procompetitive justifications for the harmful restrictions of the NAIA Limitation Bylaws is misplaced and defendant will be unable to identify valid procompetitive justifications for these harmful rules. As an example, there are already NCAA Bylaws in place and enforced which require college athletes to maintain progress toward degrees to be eligible in NCAA events, as well as Bylaws that require minimum credit hour and grade point averages for college athletes to be eligible to compete. These regulations effectively advance the NCAA's academic and amateurism goals without the undue and targeted restrictions imposed by the NAIA Eligibility Limitation Bylaws.

58.    Simple changes to the NAIA Eligibility Limitation Bylaws would promote and maintain any cognizable procompetitive justifications without restricting the ability of former NAIA athletes to participate in Division I competition. As an example, if under Bylaw 12.8.1, the Eligibility Clock begins when an athlete first registers for classes at "an NCAA member institution" (rather than at a "collegiate institution" as in the 2024-25 Bylaws), athletes who began at

NAIA would no longer be subject to the harmful anticompetitive effects of the rules as they stand currently. Similarly, changing Bylaw 12.02.06's definition of "Intercollegiate Competition" to when an athlete is "in an NCAA member institution" (as opposed to "in either a two-year or four year collegiate institution" as in the 2024-25 Bylaws), would amend the restrictive harms faced by former NAIA athletes while preserving defendants' stated procompetitive justifications. Also as an example, if the "four seasons" of competition set forth in the Five-Year Rule at Bylaw 12.8 were changed to "five seasons," this would allow all athletes to compete in as many NCAA Division I seasons as they can within five years. As demonstrated, any purported procompetitive justifications for the NAIA Eligibility Limitation Bylaws could be accomplished by less restrictive means.

## COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT: THE NAIA ELIGIBILITY LIMITATION BYLAWS

59.    Humphreys repeats and realleges each allegation set forth in the preceding paragraphs as if fully set forth throughout.

60.    Defendant NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions, have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the NAIA Eligibility Limitation Bylaws: NCAA Bylaws 12.8 (the "Five-Year Rule"), 12.02.6 (the "Intercollegiate Competition Rule"), and 14.3.3 (the Three-Year Transfer Limitation). Specifically, the NCAA and NCAA member institutions have agreed to unlawfully restrain the ability of Division I college athletes who transfer to the NCAA from a non-NCAA institution to play for the same number of years offered to every other NCAA Division I baseball player.

61.    The labor market for Division I college baseball players is the relevant antitrust market. The transactions between NCAA member institutions and college baseball players in this market are commercial in nature and fall under

the purview of the Sherman Act.

62.    This unlawful agreement among horizontal competitors has unreasonably constrained competition among schools for college baseball athletes competing in the relevant markets, as colleges are prohibited from retaining the services of an NAIA transfer like Humphreys for the four-to-five years they are permitted to retain the services of other college baseball players. This limitation is harmful to and disadvantages NAIA college baseball players seeking to transfer to an NCAA Division I college along with NAIA college baseball players who are currently playing for an NCAA Division I college. Furthermore, such limitations prevents these baseball players from attaining the benefits uniquely available to participants in NCAA Division I baseball games for the same length of time available to other college baseball players, significantly harming their current and future earning potential.

63.    NAIA college baseball players seeking to transfer to an NCAA Division I college, former NAIA baseball players currently playing for an NCAA Division I college, and consumers of college baseball have suffered and continue to suffer antitrust injury due to the reduction of competition among Division I schools for college athletes through restrictions imposed by the NAIA Eligibility Limitation Bylaws.

64.    The NAIA Eligibility Limitation Bylaws yield no cognizable benefits to competition in Division I baseball to the NCAA's member institutions, to college baseball players, or to consumers of NCAA Division I baseball games. Alternatively, any such benefits are clearly outweighed by the harms to competition and to the college baseball players are who subject to the NAIA Eligibility Limitation Bylaws. Furthermore, the NCAA Bylaws already contain less restrictive alternatives and effectively advance the NCAA's stated objectives for the continued enforcement of the NAIA Eligibility Limitation Bylaws; or could easily be modified to address such concerns.

65.    Defendant's conduct is ongoing and will continue to impose injury on current and former NAIA college baseball players and consumers of NCAA Division I baseball unless injunctive relief is granted. These ongoing harms have caused and continue to cause direct harm to Plaintiff Ryan Humphreys by restricting his ability to market himself for NIL compensation and limiting his opportunities for exposure to professional scouts. These harms do so as an unreasonable restraint on the labor market for college baseball players.

66.    Defendant and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

67.    Plaintiff asks for a preliminary restraining order, preliminary injunction, and permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman act by enforcing NCAA Bylaws 12.8, 12.02.6, and 14.3.3 as to Plaintiff, and from enforcing NCAA Bylaw 12.11.4.2 in the future to punish Plaintiff and Pepperdine University for actions taken in compliance with orders from this Court. Plaintiff also asks the Court to explicitly rule that he is entitled to play Division I college baseball in the 2025-26 school year.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks that this Court:

1.    Adjudge and decree that Defendant's enforcement of NCAA Bylaws 12.8, 12.02.6, and 14.3.3 violates Section 1 of the Sherman Act, 15. U.S.C. § 1;

2.    Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8, 12.02.6, and 14.3.3 as to Plaintiff, and from enforcing Bylaw 12.11.4.2 to punish Plaintiff, Pepperdine University, and any other NCAA member institution for actions taken in compliance with any orders from this Court;

3.    Award Plaintiff a season of NCAA Division I competition and

eligibility to take place in 2025-26 in order to avoid harm caused by NCAA Bylaws 12.8 and 12.02.6; and

4.    Order any other relief that this Court deems just and proper.

Respectfully submitted,

/s/ Howard L. Jacobs
Howard Jacobs
California Bar No. 149709

Katlin Freeman
California Bar No. 316253

Law Offices of Howard L. Jacobs
31111 Agoura Rd., Suite 225
Westlake Village, CA  91361
(805) 418-9892

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon the following person(s) via email prior to filing on the ECF system on the 9th Day of January 2026:

> Jared Tidemann
> Director of Legal Affairs
> National Collegiate Athletic Association
> PO Box 6222
> Indianapolis, IN 46206-6222
> jtidemann@ncaa.org

*/s/ Katlin N. Freeman*

Katlin N. Freeman